**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

FILED

2025 OCT 24 P 3: 26

| | | |
|---|---|---|
| **TARIK JAAFAR,** | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Civ. Action No. 1:24-cv-01714-MSN-LRVVAED |
| **GREEN, ET AL.,** | ) | |
| *Defendants.* | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff, Dr. Tarik Jaafar, proceeding pro se, respectfully submits this Memorandum in Opposition to the Motion to Dismiss filed by Defendants Joseph Green, Aaron Cross, Dr. Hack, Dr. Williams, and FCI Petersburg.

## I. INTRODUCTION

This case is not about negligence or discomfort; it is about deliberate torture and discrimination. While wrongfully incarcerated at FCI Petersburg, Plaintiff—a mentally ill, physically impaired detainee—was beaten, stripped naked, shackled for days to a steel morgue bed, and denied food, water, sleep, and medicine. Prison officials mocked his Muslim faith and Arab identity. Medical staff knowingly refused him care. These facts, taken as true, constitute cruel and unusual punishment and deliberate indifference under the Eighth Amendment, as well as violations of the Fifth Amendment, the Americans with Disabilities Act, and the Religious Freedom Restoration Act of 1993. They easily surpass the minimal plausibility threshold under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Defendants' Motion to Dismiss attempts to characterize these allegations as "new" or "non-cognizable" under *Bivens* and to assert qualified immunity. Yet the conduct here shocks the conscience and falls squarely within the Eighth Amendment's protection against cruel and unusual punishment. Dismissal at this stage would be premature and inconsistent with governing precedent.

## II. FACTUAL BACKGROUND

The handwritten amended complaint alleges that Defendants Lt Green, Lt Cross, Dr. Hack, Dr. Williams, and FCI Petersburg "tortured" Plaintiff "on a restraint chair and on 4 points" while he was under their control after having being mistakenly arrested for a misdemeanor that was ultimately dismissed. The following factual details elaborate those allegations:

As soon as Plaintiff was admitted to FCI Petersburg, he informed intake personnel of his pre-existing conditions—schizophrenia, anxiety, depression, gallstones, and a hernia—for which he was already on prescribed medication. Staff told him he would soon see a doctor, but when he asked again later, an officer replied, "there is no doctor, this is a prison."

He also informed intake personnel that he had been wrongfully arrested for violating probation and had already been in pre-trial detention for three months in Loudoun County before his case was dismissed, and this was the very same arrest and charges for which he had now been sent to Petersburg FCI, and therefore should not be there. The intake officer called Plaintiff's probation officer to verify Plaintiff's statement who confirmed it. The intake officer then told Plaintiff that he should get credit for those three months already served and be sent home, but that never happened.

After being placed in a cell, Plaintiff blacked out or lost consciousness. When he awoke, he found eight or nine officers were beating him. This lasted for four or five minutes. He blacked out again.

The next time he came to, he was naked, with his hands and feet cuffed to a cold, steel morgue-type bed. The prison officers had crossed his arms painfully under him behind his back and tied his right hand to the left restraint point and his left hand to the right restraint point, apparently because the bed was too short. One said, "it will be very painful," and another replied, "I don't care—he's too tall for the bed." He was kept that way for days, under bright lights, without food, sleep, or medication. Officers mocked him. They gave him "breaks" from restraint of 5 to 10 minutes when they uncuffed him but made him lie there on the bed. "We will take the cuffs off, but don't move. If you move, you don't know what will happen to you." Plaintiff understood that as a threat. With his gallstone and hernia conditions, Plaintiff suffered severe pain from being stretched across the restraint bed in that manner. "Don't worry," one officer said, "you'll get used to it."

The first three times they kept him restrained on the morgue bed for four days, he was only offered food and water after he was taken off it on the fourth day. He was not given bathroom breaks and soiled himself while restrained.

The subsequent fourth fifth and sixth time they restrained him on the morgue bed for 24 hours or less, and then they offered food and water.

Lt Green supervised his initial intake. Lt Green taunted Plaintiff with racial and religious slurs such as "What's a Muslim guy doing in Petersburg? This is a white county;" Why don't you stay in your terrorist country?" Green said, "People like you who stole our money deserve what you

are going through;" "How could a Muslim like you come to America and become a successful banker and steal our money." He was extremely aggressive and used profanity.

Dr. Hack later admitted the treatment was wrong and that she had been unaware he had been admitted or she would have come sooner. She also said she "already knew" his medical history from prior medical records received from another federal facility, but she neglected to do anything to prevent Plaintiff from going through the same traumatization in Petersburg by being confined unmedicated in a small cell and even promised, after he had been moved to the open warehouse-style MS 13 unit, that he would not be moved back to a cell. After her visit, officers again beat him. He was later sent to a cell.

At some point, Plaintiff was transferred by van to a different compound and again restrained on the morgue bed, beaten, and deprived of medication, food, and water for several days. That was when he realized the morgue bed restraint was in the medium security facility and that he had been transported there from the low security facility in which the intake was conducted.

In another instance, Plaintiff came to in a wheelchair. The prison officers beat him up again and smashed his head against the door. He was restrained again on the morgue table for several more days. Every day Plaintiff asked for medication for his conditions and pain but did not receive it.

Once while he was restrained, he told prison officers that his legs were turning blue. A voice at the level of his head said, "that is the good news, you will leave us." He could not see who said that, but took it to mean he would die there in prison.

Dr. Hack and her supervisor Dr. Williams approved his placement on the cold steel morgue bed.

At some point he was sent to a disciplinary unit for non-compliant prisoners, although he had committed no infractions. There, the cells seemed to be underground. Plaintiff again asked for

medication to calm his phobia of confined spaces, a phobia Dr. Hack had said she was aware of. Lt. Cross was in that unit. Plaintiff asked him why he was there. Lt. Cross said, "I don't know." They kept him there for about 2 week. Cross participated in beatings of Plaintiff in the disciplinary unit. He told Plaintiff that he would "stay here until you die."

At some point, the unit manager from the MS 13 cartel unit came to talk to Plaintiff in the disciplinary unit and admitted that they had "made a mistake" sending him there becuase Plaintiff "did not do anything wrong."

Back in general population, Plaintiff submitted 7 or 8 grievances with the help of another prisoner. One was to see the warden. The warden never came. Another other was to get his medical records that Dr. Hack had refused, saying "you're going to sue us."

When he was able to speak to the Warden and Deputy Warden purely by chance, and with the assistance of other inmates because by then he could barely walk, those officials admitted that the treatment of him was wrong and he was entitled to his medical records.

Altogether, Plaintiff was in Petersburg FCI for four months, from June 2022 to September 28, 2022. 75% of time spent there in Petersburg was in the morgue cell or the disciplinary unit he believes simply because he asked for medication every day for his serious existing conditions.

Plaintiff suffered serious medical and mental harm, including trauma, disability, and permanent physical pain. At that time, he was so injured and debilitated that he could not reasonably exhaust any administrative remedies under the FTCA.

## III. LEGAL STANDARD

A complaint should not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Erickson v. Pardus*, 551 U.S. 89 (2007). Because Plaintiff proceeds pro se, his pleadings must be liberally construed and held to less stringent standards than formal pleadings drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519 (1972).

## IV. ARGUMENT

### A. Plaintiff States a Cognizable Eighth Amendment Claim under *Bivens*

Defendants' reliance on *Ziglar v. Abbasi*, 582 U.S. 120 (2017), is misplaced. Plaintiff's claim—deliberate physical abuse and prolonged restraint amounting to torture—fits within the well-recognized *Carlson v. Green*, 446 U.S. 14 (1980), framework, which permits damages for cruel and unusual punishment and denial of medical care. Numerous courts have continued to recognize *Bivens* actions where federal officials subject prisoners to excessive force or deliberate indifference to medical needs.

### B. Plaintiff's Failure to Exhaust under the FTCA Should Be Excused

Even if construed under the Federal Tort Claims Act, dismissal would be improper. Plaintiff was physically and mentally incapable of pursuing administrative remedies at the time—he had been confined, traumatized, and left unmedicated for preexisting conditions, including anxiety and panic attacks. Courts have excused exhaustion in similar circumstances where "extraordinary physical or mental impairment" prevents timely filing. See *McCarthy v. Madigan*, 503 U.S. 140 (1992); *Days v. Johnson*, 322 F.3d 863, 867 (5th Cir. 2003) (excusing exhaustion where

plaintiff's injury prevented him from using grievance process); *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018) (unavailability where prisoner physically or mentally unable to file grievance).

**C. Exhaustion Should Not Result in Dismissal**

Under *Ross v. Blake*, 578 U.S. 632 (2016), exhaustion under the PLRA is required only when administrative remedies are actually "available." Plaintiff's physical and mental condition, coupled with fear of retaliation, rendered the grievance process effectively unavailable. Dismissal for non-exhaustion would therefore be improper.

**D. Qualified Immunity Does Not Shield Intentional Torture**

Qualified immunity does not protect conduct that a reasonable officer would know violates clearly established law. *Hudson v. McMillian*, 503 U.S. 1 (1992) (even minor injuries may constitute cruel and unusual punishment if force was applied "maliciously and sadistically to cause harm."); *Whitley v. Albers*, 475 U.S. 312 (1986). The use of restraints and beatings described here—naked confinement, pain-inducing positioning, deprivation of food, water, and medication—constitute obvious violations of the Eighth Amendment. Even minimal discovery would confirm these acts were punitive, malicious, and not undertaken in good faith to maintain order.

**E. Plaintiff's Allegations Satisfy Both the Objective and Subjective Components**

The injuries alleged—lasting physical disability, mental trauma, and prolonged deprivation—are more than de minimis. The subjective component is met where officials act "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 9. Repeated slurs, threats, and deliberate crossing of limbs to inflict pain show malicious intent sufficient to overcome dismissal.

**F. Alternative Pleading Under 42 U.S.C. § 1983**

To the extent that any of the named Defendants acted jointly with state or local law enforcement officers, or under color of state law while carrying out the acts described herein, Plaintiff asserts an alternative cause of action under 42 U.S.C. § 1983 for violation of his constitutional rights. See Hampton v. Hanrahan, 600 F.2d 600 (7th Cir. 1979) (federal officials acting in concert with state authorities may be subject to § 1983 liability); Kletschka v. Driver, 411 F.2d 436 (2d Cir. 1969) (same)."

**G. Failure of Service Does Not Warrant Dismissal of Dr. Williams**

Dismissal of Dr. Williams would be improper at this stage. Plaintiff, a *pro se* litigant proceeding in forma pauperis, has diligently attempted to effectuate service, but service of process in such cases is performed by the U.S. Marshals Service, not by the plaintiff personally. See Fed. R. Civ. P. 4(c)(3) ("At the plaintiff's request the court may order that service be made by a United States marshal or deputy marshal… if the plaintiff is authorized to proceed in forma pauperis.").

Because the failure of service was not due to any fault or neglect by Plaintiff, dismissal under Rule 4(m) would be an abuse of discretion. Courts routinely hold that when a *pro se* or incarcerated plaintiff relies on the Marshals for service, "the plaintiff should not be penalized for failure of the Marshal's Service to properly effect service." *Puett v. Blandford*, 912 F.2d 270, 275 (9th Cir. 1990); *Graham v. Satkoski*, 51 F.3d 710, 713 (7th Cir. 1995) (same); see also *Robinson v. Clipse*, 602 F.3d 605, 608 (4th Cir. 2010) (holding that "a prisoner proceeding in forma pauperis is entitled to rely on the Marshals Service for service of process" and cannot be prejudiced by delays outside his control).

Further, Rule 4(m) expressly authorizes the court to extend the time for service upon a showing of "good cause." Plaintiff's ongoing medical disability and his lack of access to identifying information for Dr. Williams constitute good cause.

Even if the Court concludes that the statute of limitations has technically expired, equitable tolling should apply. Equitable tolling is appropriate where a litigant has been prevented from asserting his rights "by some extraordinary circumstance," such as physical or mental incapacity or reliance on the court or U.S. Marshals for service. *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990).

Accordingly, Plaintiff respectfully requests that the Court (1) decline to dismiss Dr. Williams at this stage, (2) direct the Clerk or U.S. Marshals to effectuate service promptly, and (3) preserve Plaintiff's claims against Dr. Williams under equitable tolling until service is complete.

### H. Plaintiff Is Ready to Present Evidence of His Disability and Injuries Under Seal

Plaintiff is prepared to provide medical documentation and supporting declarations to the Court in camera or under seal pursuant to Fed. R. Civ. P. 5.2(d), to protect his dignity, privacy, and professional reputation.

## V. CONCLUSION

Plaintiff Dr. Tarik Jaafar respectfully requests that this Court deny Defendants' Motion to Dismiss in its entirety. In the alternative, if the Court finds any deficiency in pleading, Plaintiff requests leave to file a Second Amended Complaint to clarify and expand the factual allegations and legal bases described above. Leave should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2).

With respect to Defendant Dr. Williams, Plaintiff respectfully requests that the Court direct the Clerk or U.S. Marshals to effectuate service promptly and preserve Plaintiff's claims against Dr. Williams under equitable tolling until service is complete.

*This document was prepared using a generative artificial intelligence (AI) tool by OpenAI.*

Respectfully submitted,

TARIK JAAFAR
*Pro se*

Tarik Jaafar
1726 Troy Street,
Apt. 767
Arlington, VA 22201

10-24-2025

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of this pleading on the following:

Raul A. Ruiz
Assistant United States Attorney
United States Attorney's Office, Eastern District of Virginia
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3853
Raul.Ruiz@usdoj.gov

On this 24 day of October, 2025. 10-24-2025

Tarik Jaafar
10-24-2025.